Case number 18-5099, John Doe 1 and John Doe 2, Appellants v. Federal Election Commission. Mr. Elwood for the appellants, Ms. Ward for the appellate. Thank you, Mr. Elwood. Mr. Elwood. May it please the Court, John Elwood for the trust, known in the papers as John Doe 2. I'll also be arguing today for the trustee known in the papers as John Doe 1 and I will try not to use their numbers henceforth. Okay, I just want to make a comment about the sealed, the correspondence from the FEC about what's sealed and what's not sealed. As we understand it, the remedy sought in the complaint is redaction only of the true names of the trust and the trustee. For that reason, we understand that both sides can talk about anything in the papers other than the actual names and we would insist that both sides only refer the person I would rather call the trust and the trustee rather than John Doe 1 and John Doe 2 because I keep getting confused as to which is which. But would that be acceptable to both sides? It's certainly acceptable to the trust and the trustee. Let me just hear from the government. Is there any reason why allowing you to say anything you want to say other than the actual names of the trust and the trustee would be a problem? No. Okay, great. I think that the description of exactly the relationship may be disclosing, but I think you could generically refer to the relationship between the trust and government integrity as opposed to what exactly the nature of the relationship is. I think that that is still under seal. I understand it's under seal, but it's not the remedy that you seek. I would be inclined to unseal that unless there's no argument made anywhere in the briefs that the relationship itself discloses anything. I confess that I don't know the record well enough to contest that, so I think that probably we're okay if we stay away from their names. But in any event, the Federal Election Commission never even charged the trust or the trustee with violating federal election law, much less make a finding that they actually did violate law. The commission told us only that we were witnesses, not that we were targets of an investigation. But even though the commission has given the plaintiffs none of the procedural protections they'd be entitled to as people accused of wrongdoing under the Federal Election Campaign Act and its implementing regulations, they now seek to disclose documents that name them and allege or claim that they are money launderers who are complicit in federal election violations. We believe that disclosing their names would be unlawful for three reasons. Can I just ask, so it's not the commission that's accusing them of being money launderers. Maybe that's a slight overstatement of what even the accusation is. It's a single commissioner, and there's three other commissioners who found no reason to believe, and two of those made a statement explaining that the law wasn't at all clear, that their facts weren't at all clear, and therefore that kind of conclusion couldn't be reached. Am I right about that description of the record? You're correct about all of that, but I think that is still something that would implicate their privacy interests. This Court has said repeatedly in cases like Safecard that simply identifying somebody as the target of an investigation implicates privacy interests, and when you have people who have come out and said they're guilty, including a commissioner, I think that that heightens the privacy interests. Go ahead. I'm sorry. But if you look at the head of the first argument, the disclosure would be unlawful under the agency's FOIA regulations, and it would represent an unexplained departure from consistent agency practice. If you look at the agency's own FOIA regulations, they state that what they're going to put in the record are documents that are, let me see here, only, quote, non-exempt investigatory materials. That's 11 CFR 5.4, and that's consistent with the agency's long practice. If you look at their privacy statement or their policy, it says for the first 25 years, what they'd put into the record afterward were the documents considered by the agency, quote, minus those materials exempt from disclosure under FOIA, unquote. And they make, that's at page A7 of our appendix at the top of the third column. And they make very clear that what that means is redaction. They say they frequently, that's the word they use, redacted documents. I'm sorry. Repeat again which regulation you're talking about. This is the policy. It's at page A7. Oh, the policy, yeah. Yeah, yeah. The first regulation I talked about was 11 CFR 5.4, but this is the policy at page A7 at the top of the third column. And they say, also in the third column, that they frequently redacted documents, specifically the general counsel reports that are at issue here. Right, but you're focusing on the fact that they say they won't release non-exempt material?  Minus exempt material. Minus exempt material is what they will take out. Their position is this isn't exempt. That's their determination of whether it's exempt or not. You make a reverse FOIA argument that it's exempt. Our cases about reverse FOIA situations require a conclusion that their reading is arbitrary and capricious, not just that they would be permitted to withhold, but that they must withhold. Safeguard is a case, as the judge below explained, a straight FOIA case. It says that they are permitted to withhold names in a categorical basis. And all the cases after Safeguard always say permitted. There's no case that's compelled an agency to withhold information without a balancing test, is there? No, I think that there are cases, like, for example, the AT&T case from the Third Circuit and the portion that wasn't reversed by the Supreme Court, that say that you can make FOIA essentially mandatory by regulation. And our argument is that it's two parts. First, that the regulations themselves say that they will put in the record non-exempt material. Their view is that this is non-exempt.  The question is whether that's arbitrary and capricious. Well, because it's identifying information, connecting them to a law enforcement investigation. Right, but FOIA doesn't say that. FOIA says unwarranted. It doesn't say, it doesn't make identification information. That comes from one of our cases in a straight FOIA case, not in a reverse FOIA situation. Correct, but it says, the court said in Safeguard, though, that it said as a categorical matter that identifying information in law enforcement files was an unwarranted invasion of privacy. And I think the agency has room to do this. I mean, clearly, because they frequently redact documents, specifically the general counsel reports like we're talking about here, that is an indication that they, in the past, have routinely done this, that they've taken this kind of information out. Now, they say, they invoke A5 of FOIA. That's the provision about multi-member agencies and votes. And they say that that's why this information has to be disclosed. But if you look at the policy, that doesn't invoke A5 of the disclosures. It invokes A2. You can see that at both page, let me see here, A8, where it says this complies with the requirements of FICA and A2A. That's near the top of the third column on A8. And such disclosure is required under FICA and Section A2A of FOIA. So it only invokes A2. Why is that relevant? Because A2 specifically provides for redaction. It says that it can redact documents to eliminate identifying details and to protect privacy. Are you now quoting from FOIA? I'm now quoting, well, yes. When I'm saying about A2A, that is quoting from FOIA. Where is the words you're talking about in A2A? Those words are in A2A of FOIA. Where is it? Pardon me? Where I have it open. If you could just tell me where. The words I see are to the extent required to prevent a clearly unwarranted invasion of personal privacy and the agency may delete identifying details. If you're looking at page 26 of Title V, is that about what it is? I'm looking at the very large paragraph after 2E. Yeah. If you look about an inch down, it says to the extent required to prevent clearly unwarranted invasions of personal privacy and agency may delete identifying details. Yes, that's what I'm looking at. So there's two words in there that are significant. One is the word clearly unwarranted, which is not the word in A7, the law enforcement. So this is a tougher standard than the one we addressed in safeguard, harder to meet. And secondly, it says an agency may. It doesn't say an agency shall. So both of these go to the, once again, to the standard of review in a reverse FOIA case, which is only a question of the reasonableness of the agency's decision. I don't know off the top of my head whether the word clearly was used anywhere in safeguard and its progeny, but I think it's pretty clear that the court indicated there that that was a very important and they were very pronounced privacy interest. Yes, it was, but the word clearly is an A6 term about personal information and personnel files, and it is not included, and we have to assume intentionally, in A7 by Congress, which left the word out. Let me ask you another question. What about the problem that the trust itself is a corporation, which the Supreme Court, I'm sorry, is a trust, not a person, which in AT&T the court said can't take advantage of this A7 protection? Well, I think what it said there is that the corporation cannot itself have privacy interests. I don't know that it means that they cannot invoke it, because there are other cases where corporations did invoke it in, for example, multi-ag media LLC versus Department of Agriculture 515 F3-1224. Right, but that, first of all, that is before AT&T. So several years before AT&T, three years, I think, before AT&T. But the point is still the same, and it's the point that the government made in its own brief, which is that there can disclose, I mean, the corporation doesn't have privacy rights, but to the extent that disclosing a name infringes on people's privacy rights, that is still protected. I understand that. But now we're on the question of the trust itself. I thought the district court helpfully broke down the question into one and then the other. The language, both that we just read together about clearly unwarranted invasions of privacy and the language in A7 about unwarranted invasions of privacy, both use the word privacy. And the whole point of the FCC versus AT&T case was that there is no personal privacy for a corporation or an artificial entity. So if that's the case, I take your pivot to be the argument, well, disclosing the name of the trust might disclose the name of the trustee. Is that your argument? That is correct. I'm sorry, and the trustee obviously has an interest in keeping the name of the trust private and undisclosed. Let's go to that for a moment then. So if that's the real question, whether the disclosure of the name of the trust reveals the name of the trustee, I didn't see any affidavit, I didn't see any argument as to why that would be the case. And the government's brief raises this point. I am able to see the name of the trust, and it doesn't disclose anything. It means absolutely nothing to me. The government says that trusts, as a general matter, don't file documents publicly or anything. You haven't made any representation from which we could conclude that disclosure of the trust discloses the trustee. Am I wrong about that? I don't think that we have explicitly addressed, you know, filing an affidavit, setting forth the mechanism. But I think two responses. First, MULTIAG itself suggests that the court doesn't have to blind itself to the realities of these things. They just said basically they're a closely held corporation, of course, that's going to disclose some stuff about the actual owner's finances. And I think that, you know, for hundreds of thousands of dollars on the other side in its own lawsuit, if they thought they were going to end that, you know, kind of nondescript trust name, that it's a simple matter, you know, for people with investigators. It's not enough just to say that the other side wouldn't litigate it. They don't know what the name says. Maybe they think the name says, I don't know, John Elwood or something like that. They have no idea. It doesn't. But we can't go on that. And the dispute in MULTIAG was quite different there. The question was the information that would reveal the information about the closely held corporation. People knew who the closely held corporation was. So it's quite a different information about whether their crop data would end up disclosing finances of the known individuals who own the company. I think two things. It suggests that the showing is not that exact. And then secondly, I think, you know, the court kind of got rid of this case, you know, with a fairly, it was not very impressed with even the general argument about the privacy rights because if the trustee was operating simply as a trustee and the corporation, you know, or the trust was itself an artificial entity. And so I think that what should be done is to send it back and, you know, tell the court what the proper standard is and give us an opportunity to prove it up under that standard. I don't know if the court said, you had an opportunity. You said you don't even need a strong showing. I haven't heard any showing. That's what I'm asking for. What is the showing that disclosing the name of the trust will disclose the name of the trustee? Assuming that's important, I'm not sure whether it is. Two things. I mean, I think in the simplest case, you know, if you just get an address for the trust, call them up and say, hey, who signed the lease? You know, we've got to get in touch with them about something. And they might be able to get it that way. I mean, there was an NPR story about how, you know, just searching the Internet for public records figured out the identities of the Russian GRU agents who, you know, did the nerve agent attack in Salisbury. I mean, there's an enormous amount of information out on the Internet that is available to disclose these kind of things. And, you know, based on the kinds of showings that were permitted before, I mean, you say it's distinguishable, but still the multi-ag case suggests that it's not something you have to file some sort of, you know, extended explanation about why it's at risk. No, that's true. But in that case, they knew who the owners were. And the question was whether the crop data would reveal information about this. And since they were the owners, it would necessarily reveal it. That was apparent. This, we're getting into speculation. But I guess we should now shift on to the trustee. I'm not sure what his or her privacy interest in here is either. I think that that is answered by the Washington Post case cited by the government, where the court said that, you know, even their employees doing their jobs, if they have a privacy interest and not being implicated in criminal wrongdoing in that regard. I would have thought that was the worst possible case for you to cite. And I was frankly not going to really pay much attention to it, because it talks about intimate personal nature. That's not what this is about at all. This is a purely professional activity. Well, it is something he does in his job. But it is nonetheless he is being accused of breaking the law in his job. You know, this is not just disclosing simply the fact, you know, without any overlay at all that he is the trustee of a trust. It is that he was one of the people who was a lawbreaker. May I interrupt a second counsel? This is Judge Randolph. One is to prevent the third party, it was Crewe, who filed this complaint. What's to prevent that from simply saying that the redacted portion of whatever report gets redacted if you want? Why can't Crewe just say that here's the trust's name and here's the trustee's name? I'm not sure I understand the question, if it's redacted, how they'd identify the names. Crewe knows who the trust is and who the trustee is. Crewe knows that. Why can't the organization simply disclose it to the public if they like? No, Your Honor, I don't believe that they do know that. I don't think that they've seen the unredacted documents, Crewe. I think that that is only the court and the parties in this matter, which does not include Crewe. How about the PAC? I don't know the answer to that. It's not in the record, I think I'd say. Well, they received the money, right? They ultimately received the money, that is correct, through a number of other entities. And I don't think the record says one way or the other whether they had any inkling. Because after all, there's no finding by the FEC that the trust was actually the source of the money, much less that it directed the money along its way that ultimately wound up at the PAC. But the LLC received the money. There's no dispute about that, is there, or is there? Government integrity received the money, that's correct. So they know. There's no LLC. I have a little flowchart of how the money is alleged. I don't see anything between the trust and the LLC. I think that that's true, but I think that this would be kind of one of those things like the work product privilege, in that if it's consistent, there's nothing about that that makes it public. They haven't disclosed it so far, and so I don't think you can say because they know that nobody else has an interest in keeping that information private. Doesn't that go to the extent of your privacy interest if it's not a secret? I think it is nonpublic. I think it might go to the extent of your privacy interest, but that's not even an argument that the FEC relied on. And I think when you're talking about the reasonableness of the agency actions, that's not anything that they have relied on so far. But in any event, I wanted to get back to the regular practice, that when you're talking about whether or not what happened here is reasonable, you have to look at the fact that they frequently redacted documents to take out identifying information. And I think what we have here is an unexplained departure from that practice. Even though, again, that the agency has invoked A5 when they say you couldn't possibly redact vote certifications, we did a five-minute Google search during the last week just to see what we could find, and we found a dozen vote certifications which were redacted, suggesting that the agency had very much of the view that all of these documents can be redacted. But we don't have the results of your Google search, so it's not possible for either us or the agency to determine whether they are distinguishable or not. In any event, I mean, I would be certainly happy to submit them in any form that the court would like. And it simply shows, though, that if they're not redactable under A5, they're not redactable. I don't think there's any dispute that they are redactable. I think the government takes the position that they aren't redactable. I think we take the position that it is. Well, I thought the government also takes the position that in a reverse FOIA case, subject to arbitrary and capricious reasonableness review. And that's really the question that we have before us. There is no dispute that the trust made a political contribution in this case, or is there? I think we're not taking a position on it.  And that's what we said in the preliminary injunction motion twice. It's all that the district court found. I'm not talking about whether they made it to the PAC. Did they make something that could be described as a political contribution? We don't even take a position on that. We think it's up to the agency to demonstrate it, and they haven't done that here. But if that's the case, where's the First Amendment interest here at all? The First Amendment interest— I mean, where's the standing if you didn't even make a political contribution? The standing is that we have been labeled wrongdoers because of what the agency thinks we did. And I think that you have standing under a case like Heffernan v. City of Patterson, that even if they're wrong about what happened, the fact that they're taking some— Is that a First Amendment claim? Yeah, Heffernan was a First Amendment claim. It was a First Amendment retaliation claim where the employer mistakenly believed that this man had engaged in speeches of fire. That was in retaliation for some First Amendment act. Correct. I didn't see any allegation here that this— Well, the allegation here is that they're labeling us lawbreakers because of an alleged First Amendment act, which is— Well, what was the alleged First Amendment— —doing the contribution. But you just said you didn't make a—or you're not willing to concede that you made a— But Heffernan v. City of Patterson says it's chilling even if they're factually wrong. And it does chill us going forward because it means that we can be labeled as lawbreakers for an action that is entirely lawful without any showing that there was anything wrong with it. That is the chilling effect. So in all the chilling effect cases that we've seen, they all require some affidavit other than simply the person saying, I believe that my reputation would be hurt. This is nothing like the cases referred to in the Supreme Court's opinions, which all go back to the NAACP case where the chilling effect was long into the NAACP, in a period in which it was targeted for violence and other kinds of things. It's true, but, I mean, this is a question that is answered by the AFL-CIO case where the court said, it's true, you know, we don't have the kind of strong showing that you're going to be subject to retaliation, but merely disclosure has a chilling effect. Oh, but that is also true, but there the court was talking about tens of thousands of pages of internal documents and strategy, lists of employees, lists of supporters of the AFL-CIO. The government has responded to that problem by greatly narrowing what is going to be disclosed here. But you still have a disclosure which, in Buckley v. Vallejo, they said that even the mere disclosure can chill First Amendment rights of private association. And you combine that with the fact that they are labeling us as lawbreakers, which has a, you know, it has a strongly kind of chilling effect, that if you know in the future that you can be labeled as a lawbreaker for engaging in something that no one has ever found fault with. Back to the first question, which is who's the they here. And one commissioner, I guess you could arguably say that that's what they're doing, but two others, which form the plurality, three decided the other way and said you weren't lawbreakers. So it's not quite the same. It's not as if the FEC itself made such a determination. That is correct. But, you know, there's, you know, safeguard and all of that line of cases say merely disclosure that you are the target of an investigation gives rise to privacy interests. And here it's more than that. It's that the general counsel's office thought that you should proceed with this and that one of the commissioners thought that you were basically guilty of the violation. And I think that that is, you know, there are significant privacy interests in that. And I think that that is something that would ordinarily be recognized as having a chilling effect, to have that kind of information put out there in the public. All right. I think we're kind of way over, but if any of my colleagues want to ask questions. Okay. We'll give you some time at the end anyway. Thank you. Good morning, Your Honors. I am Haven Ward on behalf of the Federal Election Commission. May it please the Court. The district court's judgment should be affirmed. FECA, FEC regulations, and the agency's carefully crafted disclosure policy demonstrate that it is both reasonable under Chevron and constitutional under the First Amendment to disclose the Doe's identities. Let me ask you about the wording of 111.20b, which you all have promulgated subject to 4A.B. 2.2. Where does terminate or otherwise terminate its proceedings come from in the statute? And even assuming that it does, what proceeding was terminated as to the two John Doe's here? The way I read the sequence of events here is that a proceeding was never initiated. The general counsel recommended that they both try to enforce the subpoena and find reason to believe they violated the act. That was rejected. So a proceeding was never initiated. So even assuming this language comes under the statute, which I have a real question about, what proceeding here was terminated that allows you to make the John Doe's names public? Your Honor, the proceeding that was terminated was the one in which their subsidiary signed a conciliation agreement and agreed to be one of three that were paying a substantial monetary penalty. Due to the nature between the trust and the trustee and their relationship with Government Integrity LLC, they are part and parcel of several documents going in the record that are directly a part of those proceedings below. So is it your position that when you sweep in several people in the beginning but don't proceed against the two John Doe's, that that doesn't separate them out from the proceedings? In other words, when you go forward with the others, even though there's no reason to believe or there's no finding there's reason to believe and no enforcement of the subpoena, they get carried along in these proceedings? Is that your position? Such that their names can be revealed. Right. Their names appear as a central actor in both the activity below as well as the enforcement matter. So separate and apart from the vote on whether or not there was reason to believe that they themselves violated the law, they were a part of the proceedings, just as you will see in the conciliation agreement. You'll see, for example, the name of Christopher Byrd because he was involved with Government Integrity LLC. And you will see other names, both in that document and the record, of people that had a significant factual role in the proceedings below. Here, I think the case for disclosure is particularly high because they were themselves the subject of a reason to believe vote. For purposes of a matter that is growing out of the litigation. But they don't fall under the first part of that, which is if the commission makes a finding of no reason to believe or no probable cause to believe, they didn't make that finding. That is correct, Your Honor. There was not a finding that there was no reason to believe. All right. And the phrase or otherwise terminates its proceedings is, whatever the Latin term is now, I've forgotten, is a companion to a finding of no reason to believe or no probable cause to believe. That's directed at the two John Does. And so another question is, why isn't the termination of proceedings directed specifically to the John Does? You're telling me they're swept in because of the findings you made with respect to the other. Yes, Your Honor. I mean, they certainly were swept into the termination of the other proceedings, which ended with a conciliation agreement. When matters are arising out of an investigation, there is a multi-step process. So the first step is that the general counsel makes a recommendation whether or not to find reason to believe. And then the next step in that process is a vote by the commission as to whether or not to go forward with that. And so the Does were both intramural to the proceedings, which to the larger proceedings, as well as their own. But you don't need to rely necessarily on their disclosure of those proceedings. But the definition of proceedings is a multi-step process. And here the regulation specifically set forward that under 11 CFR 111.8, that the first step is a recommendation by general counsel as to whether or not to find reason to believe. And then the next step is a commission vote. And then there are further steps from that point forward. So that is a proceeding. In terms of the broader authorization for the commission ability to disclose information, I think you can look at FICA itself, where it is specifically barring only a very narrow class of documents. It is also specifically mandating disclosure of a certain set of documents. This is the characteristic gap that is reasonable for the agency to fulfill. It's well established that the commission has broad authority to interpret FICA in a reasonable manner and enact regulations that further its goal. And here, as we've explained, the disclosure policy furthers the really important government interest in both accountability and deterrence. And this applies as well to these particular does, in addition to as being a reasonable basis for the commission policy more broadly itself. Can I ask you then, since you brought up B-2 in the statute, and it begins, if a conciliation agreement is agreed upon by the commission and the Respondent. The two John Does are not Respondents, correct? That's correct, Your Honor. All right. The commission shall make public any conciliation agreement signed by both the commission and the Respondent. If the commission makes a determination that a person has not violated this act, you made no such determination with respect to John Does. That is correct, Your Honor. Okay. The commission shall make public such determination. Now, I don't see anywhere where what happened with the John Does, that is just basically refusing to take the recommendation of the general counsel, that that fits into the statute. So then you go to terminating proceedings. And I think you've told me, well, the proceedings were against all the people, the Respondents, the actual Respondents who signed the conciliation agreement. And swept into that are these two John Does against whom we took, or we made no finding and took no action. By the fact that FECA mandates the disclosure of particular information, does not mean that it has therefore barred the disclosure of any other information, Your Honor. Well, I think you've got a hard hill to climb on that. But go ahead. First thing is that if Congress had limited the FEC's ability to disclose only signed conciliation agreements, then the statement in B-1, that information derived in connection with the conciliation attempt, would be completely superfluous. There would be no point in including that in the regulation if it was already understood that the FEC was unable to disclose any other information. Let me ask you one thing about B-1. Because I've had a lot of trouble figuring out when this statute uses Respondent and when it uses Person. B-1 says, No action by the Commission or any person in connection with any conciliation attempt shall be made public without the consent. What person is this referring to? The General Counsel? I mean, it's only the Commission. No, Your Honor. That provision pertains to, as I think would be a fair reading, would pertain to other persons involved. So, for example, who might be aware and participating in any conciliation attempt. So would that include the Respondents? It would include the Respondents, although the Commission and the Respondents can together agree to disclose that information. But absent a written consent signed by both the Respondent and the Commission, that would apply as well to the Respondent, as I interpret this, or as the Commission interprets the provision, I believe. So would that include Crew? Crew, as the administrative complainant, is not a party to the investigatory proceedings. So I think it's doubtful. But I think the statute does say any person, so they would be, it would extend to them as well. Would that answer Judge Randolph's question? That is, no action by any person, including the disclosure by Crew of the names of the two John Does. Is that a reading under B-1? I don't, I don't think I'm following you, Your Honor. The B-1 is directly addressed at information derived in connection with conciliation attempts specifically. Right. That is. That's what we have here. And then a resulting conciliation agreement. No, Your Honor. The proceedings below, there might have been aspects of it that were pertaining to conciliation. But every single action that the Commission took prior to the conciliation, I can't see how it could be read so broadly. For example, the finding of reason to believe in the first instance. At that point, there's no evidence in the record that there was any attempts at conciliation. In fact, as I understand the record, conciliation wasn't even raised as a possibility for several months. Not to mention, if you're seeking discovery against the trust and the trustee, they were not party to the conciliation agreement. So there's no evidence in the record that the information pertaining to them would be falling within information derived in connection with the conciliation attempt. In fact, the Commission found out about the, both government integrity and the trust, from one of the people who was a signatory to the conciliation agreement. However, at that point in the proceedings, there's no evidence in the record that conciliation attempt had begun. Much less that the scope would be so broad as it would encompass every single thing in a matter. Well, the sequence set out by the district judge is that on August 10th of 2017, they served the subpoena on the two John Does, and they refused to honor it. By October 24th of 2017, the Commission voted unanimously to approve the conciliation agreement with the Respondents. So where is this several months you're talking about? The complaint was originally filed. Oh, from crew. Okay. Right. Okay. And there were extensive proceedings and investigations prior to that, and there's no indication in the record when and to what extent the conciliation discussion had begun. There's a requirement here that it has to be in connection with a conciliation attempt, and it applies to information derived from a conciliation attempt. Other than the fact that there was an eventual conciliation agreement, there's no indication in the record at what point the parties were attempting to conciliate, nor the scope of the information that was directly derived from that attempt itself. All right. Let me ask you this. I see where crew began this whole thing in February of 2015, two and a half years before the John Does got dragged into it. But you do agree that the first appearance they made was this subpoena served on them in August of 2017. That's what the district court says, sets out. That, I think that there is a distinction, Your Honor, between their notice and involvement and the service of a subpoena upon them. There were proceedings below regarding prior to that involving government integrity, who's their wholly owned subsidiary. Government integrity was a defunct corporation that is plain in the record, was only resurrected for the purpose of this particular proceeding. The same day, originally the commission was serving government integrity through the person who was acting as its agent during the activity that was being investigated. Then later, at a certain point, they were formally served. And in response to that, the trustee entered an appearance, activated government integrity LLC. And then from that point forward, the trust and the trustee were involved. As the Government Integrities Council indicated, and this is also in the record, it had no, he had no documents or information other than what the trust and the trustee were willing to give him. The government integrity sole manager and officer had died. So to say that the first notice that they received or their first involvement was the date of the subpoena, I think would be incorrect, Your Honor. But more importantly, there is no provision in FECA that expressly bars the disclosure of the information here. And it is, and because only certain information is required to be disclosed, is specifically barred and some is specifically mandated, then that is the quintessential gap to be filled by the agency. And here the agency is undertaken to address the court's concern, AFL-CIO, none of the documents that concern the court in AFL-CIO are disclosed anymore, not subpoena information. I take it that the nature of the questioning a few minutes ago and now that you're bringing up again is the question of what do we do when a statute requires disclosure under some, or a regulation requires disclosure under some circumstances and then is otherwise silent. And that is the expressio unius canon, which this court has generally rejected as having much play in these kind of circumstances. So all three of the members of this panel and no doubt all the members of the court have written on this and the typical quotation is, whatever its general, this is from National Shooting Sports Foundation, but is also found in the Chaney case and in the Van Hollen case, which specifically refers to the FEC and the National Association of Manufacturers case, which is the SEC. And that is, whatever its general force, we think expressio unius is an especially feeble helper in an administrative setting where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved. So that should be your answer to the question, how is it that the agency can go forward to disclose material when the statute only lists two particular kinds of material that can be disclosed? There's a difference, Your Honor, between mandating that the agency disclose something and removing its discretion from disclosing anything else. Particularly given that FECA was enacted at a time when Congress was, had just, or had recently revived FOIA and mandated a presumption of agency openness, that Congress here would sub silentio. Well, it's not just that there's a context here. There's another statute, which is the Freedom of Information Act, which compels this agency and all others to disclose dissenting and concurring opinions unless clearly, but allows redaction unless clearly unwarranted in the nature of privacy, and compels disclosure of all other documents unless some exception applies, which the only one being argued here is seven, and those are not just authority for the agency to disclose, those require the agency to disclose. So the only question seems to be whether it's reasonable or arbitrary and capricious to not regard this exemption as applying to the trust and the trustee. Is that wrong? I think that is the court, where the court, is appropriate for the court's ultimate inquiry, is whether or not it is an abuse of discretion to have not found that it was clearly unwarranted to remove the identifying information of the trust and the trustee. As you noted before, the trust does not have privacy rights that are protected by FOIA under the recent Supreme Court case, and as to the trustee, the privacy interests are much more limited because he was acting in a business capacity, and to the extent that he was named in the proceedings, it was solely in his official capacity. At the same time, you have the very important government interests of accountability and deterrence, both of which are furthered here by the disclosure of the name of the trustee. Unlike other law enforcement agencies, the central importance of FECA being enforced by a nonpartisan commission is repeated over and over and over throughout FECA. You have the fact that there is an even number of commissioners, which in itself is unusual. You have the mandate that no more than three can be of a particular party. You also have the express requirement in FECA that to be eligible to be appointed to the commission requires impartiality, and you also have the mandate that both the chair and the vice chair are from different parties. Both the open acknowledgment as to the commissioner's party affiliations, as well as FECA's attempt to assure the public that FECA is being enforced in an impartial and nonpartisan way demonstrates why the FEC must be able to disclose significant persons under investigation. These are not people that were tangentially related, just swept up in a commission investigation. Isn't there something in addition, particularly after Citizens United, that one can say that there is the statute itself exhibits a general policy that the public should be made aware of the source of political contributions? Your Honor, I think that would be a fair reading of Citizens United, and while there has been debate in the briefing in this court, there is no debate in the record below that the money at issue came from the trust. So whether or not they were the true source and whether or not they were potentially subject to liability under the statute, the money did originate from them, and that was not disputed below in the district court or in front of the agency. No further questions? I think we've now let you go over as much as we've let opposing counsel go over. Are there questions, Judge Randolph or Judge Henderson? No. Okay, fine. Thank you, Your Honor. Although you are over, we'll give you two more minutes. Thank you, I appreciate it. You're welcome. I wanted to just say a word about the government's stated interest in accountability and deterrence. I think to begin with, the argument about deterrence is misplaced because they haven't shown anything that they are deterring. They've never been any sort of finding that what we did here was wrong or improper in any way. As far as accountability goes, these courts have historically unpacked the names of parties from accountability. The idea is that there's nothing about the person's name that is essential for the public to know about. You can see that in the Reporters Committee case. Just a quick quote, there is no need to identify the individuals involved in a matter if the identification has no bearing or effect on the general public. So that's a case about rap sheets, which is quite a different question here. The issue is, I think as Judge Randolph put it, political accountability both of the sources of funds and of the agency, as agency counsel was talking about, about making sure that the agency isn't preferring one party over another. I'm not saying there's anything in the record, because there isn't anything in the record that we can see for the name, but to ensure that all the cases in which they find no reason to believe don't come from one party and all the ones where they find reason to believe come from another party or something like that. So this is different than, even on a theoretical level, this seems different than Reporters Committee. Reporters Committee, what I was reading there, was talking about a hypothetical tax matter, and it was saying that it's a general matter for all these things. Three quick points and I'll sit down, which is, there's no reason at all to do it any differently in the election contest. This court said in AFL-CIO that the FEC is unique and that all it does, its purpose, is to regulate constitutionally protected expression. Secondly, Congress recognized that disclosure wasn't all that necessary because they only mandated two things, conciliation agreements and findings that people aren't liable. And third, you don't need to disclose names to have some sort of public interest that things are okay, because it's a multi-member commission with two opposing parties. So all six people would essentially have to be on the tape for somebody not to say, this person's getting special treatment because of who they are. And the government's rationale... I thought it requires four commissioners to do anything. No, but any one of them could say, this guy's getting special treatment because of who he is. Well, I thought that was your complaint about what Weintraub was doing. It would be enough to allow them to do judicial review, and then they could go up on the court and all of you could see the name. So this case, I understand, is also being litigated on the question of whether there's judicial review. Do you think they're entitled to judicial review? I think the government and us agree, both parties at the tables agree that they're not entitled to judicial review. Okay, so then it's not enough to get up to judicial review. But, I mean, on the facts of this case, again, if it's a dismissal, they might have enough for review. There's limited basis for judicial review, and here there was a conciliation agreement. But my point is just that there are built-in mechanisms to provide some assurances that it's not just going to be swept under the rug. And all of those are reasons why the court should not exempt the Federal Election Campaign Act from the ordinary presumption that names of individuals and files stay private. Thank you. We'll take the matter under submission. Very good argument on both sides. We appreciate it.
judges: Garland, Henderson, Randolph